**RAILWAY LABOR EXECUTIVES' ASSOCIATION, Appellant,**

v.

**PITTSBURGH & LAKE ERIE RAILROAD COMPANY.**

No. 87–3664.

United States Court of Appeals, Third Circuit.

Argued Oct. 21, 1987.

Decided Oct. 26, 1987.

John O'B. Clarke, Jr. (argued), Highsaw & Mahoney, Washington, D.C., for appellant.

Richard L. Wyatt, Jr. (argued), Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., for appellee.

Clyde J. Hart, Jr. (argued), I.C.C., Washington, D.C., for amicus curiae I.C.C.

Before SLOVITER, BECKER and MANSMANN, Circuit Judges.

## OPINION OF THE COURT SUR MOTION FOR SUMMARY REVERSAL

SLOVITER, Circuit Judge.

The district court entered an order on October 8, 1987 enjoining the Railway Labor Executives' Association (RLEA), an association of the executive officers of nineteen railroad unions, from proceeding with its strike against defendant Pittsburgh & Lake Erie Railroad Company (railroad or P & LE).[1] RLEA appeals from that order contending, *inter alia,* that the district court had no jurisdiction to issue the injunction because section 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104, has withdrawn jurisdiction from the federal courts to enjoin the strike activity involved in this case. Before us is the motion of RLEA to summarily reverse the district court or in the alternative to stay the injunction pending appeal, on which we have held expedited oral argument.

### I.

The following facts are not disputed for purposes of this appeal: P & LE has collective bargaining agreements with various labor organizations whose chief executive officers are members of RLEA. Some of these agreements contain provisions protecting the job security of certain covered employees for their working lives. On July 8, 1987, P & LE entered into an agreement to sell to P & LE Railco, Inc. (Railco), a

---

1. The district court's order, although denominated a temporary restraining order, was in substance a preliminary injunction since it was issued after notice and a hearing, was not limited in time, and provided that it shall remain in effect until the court rules on the preliminary injunction for which no hearing has yet been scheduled. Accordingly, we have jurisdiction over this appeal pursuant to 28 U.S.C. § 1292(a)(1). *See Professional Plan Examiners v. Lefante,* 750 F.2d 282, 287 (3d Cir.1984); *San Francisco Real Estate Investors v. Real Estate Investment Trust,* 692 F.2d 814, 816 (1st Cir. 1982).

newly-formed subsidiary of Chicago West Pullman Transportation Corporation, all of P & LE's rail lines and certain operating properties. The jobs of P & LE's approximately 750 employees would be affected by the sale because Railco intends to drop approximately 500 employees and does not intend to comply with or assume any of the existing labor agreements between P & LE and its unions.

The unions were notified by P & LE on July 30, 1987 of the pending agreement, and promptly wrote to P & LE noting P & LE's failure to send notice under section 6 of the Railway Labor Act, 45 U.S.C. § 156, and requesting the railroad to bargain over, among other things, the effects of the transaction on its employees.[2] P & LE responded that the transaction is controlled by the Interstate Commerce Commission (ICC) and that section 6 bargaining would usurp the ICC's authority.

On August 19, 1987, RLEA filed a complaint in the United States District Court for the Western District of Pennsylvania against P & LE to enforce the employees' rights under the Railway Labor Act. RLEA sought a declaration that the provisions of the Railway Labor Act were applicable to this transaction, a declaration that the sale could not be consummated until all Railway Labor Act dispute resolution procedures have been exhausted, and an injunction prohibiting P & LE from completing the transaction until that time.

On September 15, 1987 the RLEA commenced a strike against P & LE. P & LE filed an answer to the complaint and a counterclaim seeking to enjoin the strike. The strike was temporarily halted by stipulation for a short period of time but continued thereafter. On September 21, 1987 the district court denied the railroad's request for a temporary restraining order against the strike, holding that such an injunction was precluded by section 8 of the Norris-LaGuardia Act, 29 U.S.C. § 108, because the railroad had not complied with its obli-

gation under section 6 of the Railway Labor Act, 45 U.S.C. § 156, to give notice, bargain, and maintain the status quo.

On September 19, 1987 the purchasing company, Railco, filed a notice of exemption with the ICC pursuant to 49 C.F.R. § 1150.31. RLEA filed a petition for a stay, a petition for rejection of the notice of exemption, and a complaint seeking an order preventing consummation of the sale. The ICC denied the request for a stay on September 25, 1987. RLEA filed a petition for revocation, which is pending.

Following the ICC's action, P & LE filed a renewed motion for a temporary restraining order, and, after a hearing on October 8, 1987, the district court entered the injunction order which is the subject of this appeal.

In essence, the district court found that the strike substantially curtails the operations of P & LE, that it would cause P & LE's customers and employees to suffer irreparable harm, and that an injunction against the strike was warranted because, by approving the sale of P & LE's assets to Railco, "[t]he ICC, and the statutes and regulations under which it operates, has eliminated the effects of the sale upon P & LE employees as a legitimate consideration in the granting of injunctive relief." Transcript of October 8, 1987 at 77.

The RLEA appeals. Because we conclude that section 4 of the Norris-LaGuardia Act divests the district court of jurisdiction to enter the injunction of October 8, 1987, we will summarily reverse,[3] without considering RLEA's additional argument relying on section 8 of the Norris-LaGuardia Act.

## II.

Under the mandate of the Norris-LaGuardia Act, 29 U.S.C. §§ 101–15, as revealed by the words of the statute, the

---

**2.** Under the Railway Labor Act, there can be no unilateral action which would change the terms and conditions of employment while the procedures of the Act are being followed. *See* 18H T. Kheel, Business Organizations: Labor Law § 50.05[1] at 50–24 (1986).

**3.** *See* Internal Operating Procedures of the Third Circuit, Chapter 17.

unmistakably clear legislative history,[4] and a long line of Supreme Court cases, district courts lack the power to enjoin employees from exercising their right to strike. *See, e.g., Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Association,* 457 U.S. 702, 708, 102 S.Ct. 2672, 2678, 73 L.Ed.2d 327 (1982); *Milk Wagon Drivers' Union Local No. 753 v. Lake Valley Farm Products, Inc.,* 311 U.S. 91, 101–03, 61 S.Ct. 122, 127–28, 85 L.Ed. 63 (1940).

Section 4 of the Act is explicit:

No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from ...

(a) Ceasing or refusing to perform any work or to remain in any relation of employment.

29 U.S.C. § 104 (1982).

Notwithstanding this unambiguous language, the Supreme Court has, in certain limited circumstances, determined that there should be an "accommodation" of Section 4's seemingly blanket prohibition on the exercise of the district court's injunctive powers. For example, in *Boys Markets, Inc. v. Retail Clerk's Union Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), the Supreme Court held that a federal court is not precluded from enjoining a strike in breach of a collective bargaining agreement that contains a no-strike clause and a mandatory grievance adjustment or arbitration procedure. In light of the strong federal labor policy in favor of labor arbitration, the Court concluded that "the core purpose of the Norris-LaGuardia Act is not sacrificed by the limited use of equitable remedies to further this important policy." *Id.* at 253, 90 S.Ct. at 1594.

■ P & LE argues, and the district court found, that the Norris-LaGuardia Act must be accommodated to the Interstate Commerce Act. However, the Norris-LaGuardia Act will be accommodated to another federal statute only if that statute irreconcilably conflicts with the command of the Norris-LaGuardia Act and such an accommodation is necessary to enforce some other overriding and equally clear federal labor policy.

A review of the development of the accommodation cases shows that they have focused on "the need to accommodate two statutes when both were adopted as a part of a pattern of labor legislation." *Brotherhood of R.R. Trainmen v. Chicago River and Indiana R.R. Co.,* 353 U.S. 30, 42, 77 S.Ct. 635, 641, 1 L.Ed.2d 622 (1957). *See e.g., id.* at 39–42, 77 S.Ct. at 639–41 (plain language of Railway Labor Act requiring that "minor" disputes be submitted to arbitration and legislative history demonstrating Congressional intent that Railway Labor Act grievance procedure be construed as a compulsory substitute for employee's economic self-help require accommodation of Norris-LaGuardia Act's anti-injunction provision); *Brotherhood of Locomotive Engineers v. Louisville and Nashville R.R. Co.,* 373 U.S. 33, 41–42, 83 S.Ct. 1059, 1063–64, 10 L.Ed.2d 172 (1963) (procedure in Railway Labor Act for judicial review of monetary awards by National Railroad Adjustment Board is integral part of Railway Labor Act grievance procedure which would be violated by a strike); *Chicago & North Western Ry. Co. v. United Transp. Union,* 402 U.S. 570, 581–84 & n. 18, 91 S.Ct. 1731, 1737–39 n. 18, 29 L.Ed.2d 187 (1971) (union could be enjoined from striking if it failed to perform its obligations under the Railway Labor Act to "exert every reasonable effort to make and maintain agreements"; the "earlier, general provisions" of the Norris-LaGuardia Act must accommodate the "subsequent, more specific provisions" of the Railway Labor Act when they are in "irreconcilable conflict"). *Cf. Brotherhood of R.R. Trainmen v. Howard,* 343 U.S. 768, 774–75, 72

---

4. *See* H.R.Rep. No. 669, 72d Cong., 1st Sess. 7–8 (1932).

S.Ct. 1022, 1025–26, 96 L.Ed. 1283 (1952) (union could be enjoined from racially discriminatory practices which are in violation of Railway Labor Act).

■ P & LE's argument, joined by the ICC as amicus curiae,[5] that the Interstate Commerce Act is comparable to the Railway Labor Act and that, therefore, the prohibitions of the Norris-LaGuardia Act must be accommodated to the ICC's actions, is unpersuasive. The Interstate Commerce Act, as amended, lists fifteen policies relevant to the regulation of the railroad industry. 49 U.S.C. § 10101a. These include allowing competition and the demand for services to establish reasonable rail transportation rates, minimizing the need for federal regulatory control, and promoting a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues, as determined by the ICC. 49 U.S.C. § 10101a(1), (2), (3). Among the other policies listed are encouragement and promotion of energy conservation, 49 U.S.C. § 10101a(15), and encouragement of "fair wages and safe and suitable working conditions in the railroad industry." 49 U.S.C. § 10101a(12). Nothing in the statutory language suggests that this incidental reference to "fair wages" converts the regulatory scheme over rail transport into a labor law.

Pursuant to the Act, the ICC has been given authority to approve various transactions, including acquisitions, involving rail carriers. When there is a consolidation, merger or acquisition involving existing rail carriers, the ICC must impose certain employee protective provisions. 49 U.S.C. § 11347. However, it is P & LE's position, and the RLEA concedes for purposes of this appeal, that the P & LE sale is not governed by section 11347, but that the transaction falls within the ambit of 49 U.S.C. § 10901 covering the acquisition of a rail carrier's operation by a non-carrier. Section 10901 gives the ICC discretion to require the imposition of employee protective provisions, but does not make imposition of these provisions mandatory.[6] *Compare* 49 U.S.C. § 10901(e) ("Commission *may* require" labor protective provisions) (emphasis added) *with* 49 U.S.C. § 11347 ("Commission *shall* require" such provisions) (emphasis added). In fact, on December 19, 1985, the ICC adopted final rules exempting from regulation almost all acquisitions and operations under 49 U.S.C. § 10901, *Ex parte No. 392 (Sub-No. 1)*, 1 I.C.C.2d 810 (1985), *review denied sub nom., Illinois Commerce Commission v. ICC*, 817 F.2d 145 (D.C.Cir.1987), thereby placing upon a protester the burden of filing a petition to revoke the exemption. The ICC stated that such revocation would be granted only in an "extraordinary case" by "an exceptional showing of circumstances" justifying the imposition of labor protection. *Ex Parte No. 392*, 1 I.C.C.2d at 815. No such revocation has been granted since the decision in *Ex Parte No. 392*. *See Central Michigan Ry.—Acquisition and Operation*, ICC Finance Docket No. 31059, served September 4, 1987 (unpublished) (Dissenting opinion of Vice-Chairman Lamboley).

Neither 49 U.S.C. § 10901 nor 49 U.S.C. § 11347, the other provision relied on by P & LE which makes the ICC's authority "exclusive" with respect to combinations of carriers, contains any language which would suggest Congress intended to override the anti-injunction policy of section 4 of the Norris-LaGuardia Act by the Inter-

---

**5.** The ICC filed a motion to intervene in this appeal. We granted it leave to file a brief as amicus curiae and to present oral argument.

**6.** Section 10901(e) provides that "[t]he Commission *may* require any rail carrier proposing both to construct and operate a new railroad line to provide a fair and equitable arrangement for the protection of the interests of railroad employees who may be affected" by a decision to operate a new railroad line (emphasis added). The ICC has suggested that its authority to impose labor protection is not limited by the plain language of this section, but instead extends to any transaction covered by section 10901. *See* Ex Parte No. 392 (Sub-No. 1), 1 I.C.C.2d 810, 815 (1985), *review denied sub nom., Illinois Commerce Comm'n v. I.C.C.*, 817 F.2d 145 (D.C.Cir. 1987).

state Commerce Act. The ICC's authority to consider the incidental effect of the transaction on labor and its discretionary authority to require provisions that protect employees do not make the Interstate Commerce Act comparable to the Railway Labor Act, which contains a comprehensive scheme of alternative dispute resolution mechanisms. Neither the ICC nor P & LE have pointed to any language in the legislative history of any of the labor laws or the Interstate Commerce Act which suggests that the strong national policy embodied in the Norris-LaGuardia Act is to be subordinated to the ICC's authority to approve an acquisition of railroad property.

Arguments comparable to those made by P & LE were rejected by the Supreme Court in *Order of R.R. Telegraphers v. Chicago & Northwest Ry. Co.*, 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960). In that case, the Supreme Court held that the absolute prohibition of the Norris-LaGuardia Act against enjoining strikes growing out of any labor dispute deprived the district court of the jurisdiction to enjoin a strike that arose out of a railroad's decision to close several stations. Although the closings had been approved pursuant to the Interstate Commerce Act by the relevant state public utility commissions, and the railroad argued that the strike ran "counter to the congressional policy expressed in the Interstate Commerce Act to foster an efficient national railroad system," *id.* at 342, 80 S.Ct. at 767, the Court held controlling "other legislation ... like the Railway Labor and Norris-LaGuardia Acts [where] Congress has acted on the assumption that collective bargaining by employees will also foster an efficient national railroad service." *Id.* The majority of the Court rejected the argument of Justice Whittaker, writing for four dissenters, that because Congress had given the ICC and the public utility commissions exclusive jurisdiction over the regulation of station closings, the issue was removed from the field of collective bargaining. The Court also rejected the argument (similar to that made by P & LE before us) that a failure to enjoin the

strike could lead to "the financial debilitation" of the railroad. *Id.* at 342, 80 S.Ct. at 767. The Court made clear that such arguments must be addressed to Congress, and not to the courts which are obligated to follow the provisions of the Norris-LaGuardia Act. Significantly, at the time of the *Telegraphers* decision, section 5(2)(f) of the Act, the predecessor of 49 U.S.C. § 11347, provided that the Commission "*require* a fair and equitable arrangement to protect the interests of the railroad employees affected." Act of Sept. 18, 1940, ch. 722, Title I § 7, 54 Stat. 906–07 (repealed 1978); current version at 49 U.S.C. § 11347. (emphasis added).

The *Telegraphers* case was relied on by the Fifth Circuit in its decision holding that a district court had no jurisdiction to enjoin a strike protesting changes in working conditions that resulted from consolidation of certain operations of several railroads, even though the ICC had approved the transaction. *See Texas and New Orleans R.R. Co. v. Brotherhood of R.R. Trainmen*, 307 F.2d 151 (5th Cir.1962), *cert. denied*, 371 U.S. 952, 83 S.Ct. 508, 9 L.Ed.2d 500 (1963). Judge Rives, writing for the court, explained, in reasoning we find applicable and persuasive, that the Interstate Commerce Act is not one of those rare statutes to which the Norris-LaGuardia Act must be accommodated. Such an accommodation need only be made "where Congress, through such detailed legislation as the Railway Labor Act and Taft Hartley Act, 29 U.S.C. § 141 *et seq.*, has 'channelled these economic forces [capital and labor] ... into special processes intended to compromise them' [*Brotherhood of R.R. Trainmen v. Chicago River & Indiana Ry. Co.*] (353 U.S. at 41, 77 S.Ct. at 640) and where these processes would be frustrated without injunctive aid." 307 F.2d at 157 (ellipsis and first brackets in original). The court continued:

> The types of special processes which the courts have enforced with injunctive relief have all involved extensive negotiations and bargaining between the parties, or agreements which result from such

bargaining; never processes which allow management to unilaterally choose a change in working conditions and give the union a small voice of protest if the change is unfair or inequitable.

*Id.* at 158. This language is directly applicable here, since, in the absence of any provision requiring "extensive negotiations and bargaining," RLEA and the employees it represents would be relegated to "a small voice of protest" without the possibility of either negotiation or economic self-help.[7]

Just last Term the Supreme Court reiterated the Norris-LaGuardia Act policy barring judicial intervention in labor disputes. In *Burlington Northern R.R. Co. v. Brotherhood of Maintenance of Way Employees,* — U.S. ——, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987), the Court unanimously held that the district court has no jurisdiction to enjoin a strike against a railroad which took place after the parties exhausted the settlement procedure mandated by the Railway Labor Act. The Court declined to narrow the definition of "labor dispute" in the Norris-LaGuardia Act, and reaffirmed that "the legislative history leaves no doubt that Congress intended the Norris-LaGuardia Act to cover the railroads." *Id.* at 1848. It viewed Congress' policy expressed in the Norris-LaGuardia Act as inconsistent with a narrow construction of the statute and left it to Congress to restore federal court power to enjoin strikes and picketing if it so chooses. *Id.* at 1849–50, 1855.[8]

We are, of course, cognizant that a strike will cause economic hardship to the railroad, its shippers, and the community. Such harm is a consequence of the congressional policy leaving resolution of disputes to economic self-help by the parties. We intimate no view as to whether the provisions of the Railway Labor Act are applicable to this dispute so that the district court would be entitled to enjoin the strike while that Act's dispute resolution mechanisms are underway. RLEA's complaint seeking a declaration that the Railway Labor Act is applicable to this dispute is the merits issue before the district court. The only issue before us is the jurisdiction of the district court to issue the order of October 8, 1987.

Because we have concluded that the district court was without jurisdiction to enter an injunction, we will reverse that order and remand this case for further proceedings.

---

**7.** It is noteworthy that in *Texas and New Orleans R.R.,* the court held the strike could be maintained even though the ICC had issued certain labor protective provisions, 307 F.2d at 154.

**8.** The district court relied on *Missouri Pacific R.R. Co. v. United Transp. Union,* 782 F.2d 107 (8th Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 3209, 96 L.Ed.2d 696 (1987), where the court held that because of ICC approval of a rail consolidation it could enjoin a strike over the employer's refusal to bargain over the effects of that transaction. That decision is distinguishable.

First, the statutory exemption relied on by the Eighth Circuit (a "carrier, corporation, or person participating in [an] approved or exempted transaction is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let that person carry out the transaction," 49 U.S.C. § 11341(a)) applies only to transactions "approved by or exempted by the Commission *under this subchapter.*" (emphasis added). "[T]his subchapter" refers to Subchapter III of Chapter 113 of the Interstate Commerce Act, §§ 11341–51, under which the transaction in *Missouri Pacific* was approved, and not to 49 U.S.C. § 10901, Subchapter I of Chapter 109 of the Act, applicable here.

Second, the Eighth Circuit itself noted that "[a]ffected employees are not left out in the cold, because § 11347 *requires* the ICC to impose employee protective conditions." *Missouri Pacific,* 782 F.2d at 112 (affirming and quoting the district court's opinion, 580 F.Supp. 1490, 1505–06) (emphasis added). However, as noted in the text, there is no such requirement under 49 U.S.C. § 10901(e).